Jeffrey BERMAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

CIVIL ACTION NO. 3:96–1708.

United States District Court, M.D. Pennsylvania.

Feb. 28, 2002.

Stephen A. Whinston, Berger & Montague, Philadelphia, PA, Kendall S. Zylstra, Berger & Montague, PC, Philadelphia, PA, for Jeffrey Berman.

Larry B. Selkowitz, U.S. Attorney's Office, Harrisburg, PA, Mark Everett Morrison, U.S. Attorney's Office, Harrisburg, PA, for U.S.

## MEMORANDUM and ORDER

NEALON, District Judge.

The plaintiff originally filed the instant complaint pursuant to the Federal Torts Claim Act (FTCA), 28 U.S.C. § 2671 *et seq.*, and 28 U.S.C. § 1346(b), in the United States District Court for the Eastern District of Pennsylvania on June 10, 1996. (Doc. 1, Eastern District of Pennsylvania). By Order dated September 11, 1996, the Eastern District approved a stipulation by plaintiff's counsel and the United States Attorney's Office that the action be transferred to the Middle District of Pennsylvania under 28 U.S.C. § 1404(a) and (b). (Doc. 7, Eastern District of Pennsylvania). In his complaint, plaintiff seeks to recover damages against the defendant for failure to render timely, adequate and proper medical treatment.

The parties submitted pretrial memorandums on July 27, 2000 (Docs. 46 & 47), followed by a joint statement of undisputed facts on August 7, 2000 (Doc. 58). Trial commenced before the undersigned on August 8, 2000, and concluded on August 23, 2000. During the course of trial, the court heard live testimony from the following witnesses: Jeffrey Berman, Judith Berman, David Leidig, Dr. John Barry, Dr. Anthony Colletta, and Dr. Larry Sollenberger. In addition to live testimony, the court received deposition testimony from Dr. Vladimir Petorak, Dr. Arthur Keiper, Dr. Nayeem Akhtar, Dr. Daniel Romero, Dr. Thomas Colley, Dr. Anthony Cubb, Dr. Charles Wilson, Dr. Patrick Trinkle, Dr. Robert Jacobsen, David Combs, Richard Haas, Pamela Hemphill, Roland Williams, and Diane Flahart. Subsequently, the parties submitted separate findings of fact and conclusions of law, as well as responses thereto. (Docs.84–88). For the reasons which follow, the plaintiff will be awarded damages in the amount of $178,294.

### Legal Standard

The FTCA allows federal prisoners to pursue suits against the United States in an effort to recover for personal injuries

sustained during confinement by reason of negligence of government employees. *United States v. Muniz,* 374 U.S. 150, 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); 28 U.S.C. § 1346(b). The primary purpose of the FTCA is to "remove sovereign immunity of the United States from suits in tort, and with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States,* 369 U.S. 1, 6, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); 28 U.S.C. § 1346(b). Under the FTCA, "the law of the place where the alleged act or omission occurred is to be applied." *Turner v. Miller,* 679 F.Supp. 441, 443 (M.D.Pa.1987); 28 U.S.C. § 1346(b). Because most of the conduct giving rise to the petitioner's claim occurred at USP–Lewisburg, Pennsylvania state law will apply.[1]

■■■ The United States Bureau of Prisons has a duty to provide adequate medical care to a prisoner. *Yosuf v. United States,* 642 F.Supp. 415, 427 (M.D.Pa. 1986). In order to succeed on the present claim, plaintiff must show by competent medical evidence that the conduct of the medical personnel treating him fell below the standards of reasonable medical practice under the circumstances and proximately caused his injuries. *Lira v. Albert Einstein Medical Center,* 384 Pa.Super. 503, 559 A.2d 550, 552 (1989). A physician is liable for failure to exercise ordinary skill, care and diligence which results in injury to the patient. *Incollingo v. Ewing,* 444 Pa. 263, 299, 282 A.2d 206 (1971).

Furthermore, "the plaintiff generally must present an expert who will testify, to a reasonable degree of medical certainty, that the acts of the defendants deviated from the acceptable medical standards, and that the deviation constituted a substantial factor in causing the plaintiff's injury." *McCabe v. Prison Health Services,* 117 F.Supp.2d 443, 456 (E.D.Pa.) (citing *Mitzelfelt,* 584 A.2d at 892). There is only one exception to the requirement of expert witness testimony in medical malpractice claims: where the matter is " 'so simple, and lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons.' " *Id.* (quoting *Brannan v. Lankenau Hospital,* 490 Pa. 588, 417 A.2d 196, 201 (1980)).

The record is not completely clear as to who had the responsibility, the physicians or the prison staff, to supply appropriate bags; to arrange for and oversee the dilatations; to schedule appointments; and to remain in communication with outside physicians. In any event, the standard of care fell below acceptable standards whether analyzed under the definition of medical malpractice or general negligence law applicable in a prison context. Moreover, the testimony of Dr. Colletta, as well as that of Dr. Petorak and Dr. Wilson, provided the expert evidence and established the causal link between the breach of duty and the injuries sustained by the plaintiff.

*Factual Narrative*

The following factual narrative shall constitute findings of fact in accordance with Federal Rule of Civil Procedure 52(a).

1. Although most of the conduct giving rise to the plaintiff's complaint occurred in Pennsylvania, some of the conduct also took place in Texas. Under Texas law, a plaintiff must establish: (1) a legally-cognizable duty requiring the defendant to conform to a certain standard of conduct for protection of another against an unreasonable risk; (2) a failure by the defending party to conform to the required standard; (3) resulting actual injury to the complaining party; and (4) a reasonably close causal connection between defending party's conduct and the resulting injury to the complaining party. *Cloys v. Turbin,* 608 S.W.2d 697, 700 (1980). Nonetheless, the standards applied by both states are similar and will not alter the outcome of the court's judgment.

As the result of a childhood illness, plaintiff, Jeffrey Berman, had his colon, rectum, large intestine, and portions of his small intestine removed at the age of 8. (Doc. 58, ¶ 1). In order to continue to eliminate waste, the surgeons constructed an ileostomy, which is an opening in the abdomen through which the end of the remaining small intestine would be exposed. The waste would empty through the hole in the abdomen called the stoma into a small plastic bag attached to the ileostomy. The waste is caustic and, if it comes into contact with the skin, it can cause inflammation and scarring which can create a stricture, a tight circumferential scar that can inhibit the flow of the waste. To function properly, it is essential that the ileostomy remain open. This requires a process known as dilatation, which entails the insertion of a lubricated instrument of graduated circumference, known as a dialator, into the ileostomy. Dilatation is not normally recommended in the absence of stricture. (Colletta Tr. at p. 21). The plaintiff, however, was directed by his doctors to dilatate due to his young age when his ileostomy was created. It was believed that regular dilatations would forestall any tendency to stricture based on his growth. (Doc. 86, p. 3, § 7) (Colletta Tr. at 18). The defendant does not challenge the plaintiff's representation that he faithfully followed the prescribed treatment and care for his condition prior to his incarceration.

Berman was incarcerated on May 7, 1990, following a conviction in the United States District Court for the Eastern District of Pennsylvania. He eventually arrived at FPC Lewisburg on September 8, 1993. While incarcerated prior to September of 1993, the plaintiff was allowed to follow his pre-incarceration care, which included self dilatations at regular intervals, the use of sufficient numbers of properly sized closed end bags (7–10 per day)[2], and salves and ointments for skin care. Nevertheless, plaintiff experienced some problems with his condition prior to Lewisburg, viz., July 3, 1990—frequent episodes of stomal bleeding and irritation (Defendant Exhibit 5); December 27, 1990—little bleeding from ileum (Defendant Exhibit 10); September 25, 1991—ileostomy dysfunction/obstruction (Defendant Exhibits 11 & 12); and April 17, 1992—pain, stomal irritation, and ileostomy dysfunction/obstruction (Defendant Exhibit 15).

All of the care products needed by the plaintiff were sent to Lewisburg from the prior institution. Except for the problems hereinbefore described, when the plaintiff arrived at Lewisburg on September 8, 1993, his ileostomy was relatively healthy. It deteriorated significantly while at Lewisburg and Fort Worth. The cause of this deterioration would have to be: (a) a natural consequence of his condition; (b) failure by plaintiff to take care of himself or take advantage of available treatment; (c) failure of prison officials to provide reasonable care; (d) improper treatment by outside physicians; or (e) all of the above in different proportions. Moreover, it must be pointed out that plaintiff was not a run-of-the-mill prison patient with the usual complaints—he had a rare condition and, thus, prison officials should have been more alert to, and concerned with, the type of treatment he required.

*Lewisburg—September 8, 1993*
*to February 10, 1994*

Upon arrival at Lewisburg, Berman advised Camp Administrator David Combs of his condition and needs. He specifically informed him of the treatment he received

---

**2.** Defendant contends that for a significant period of time plaintiff was issued 6 closed end bags per day according to the medical records.

in the other prisons, and that his condition required 7–10 closed bags per day. Prison officials were unfamiliar with the treatment of ileostomy patients and promptly filed two transfer requests with the Bureau of Prisons (BOP) because it was determined that they could not provide him with the required medical care. (Doc. 86, p. 6, ¶ 18). Lewisburg had only two physicians to care for approximately 2,000 inmates. (Doc. 86, p. 5, ¶ 17). The transfer requests were denied.

Berman became concerned after his arrival at Lewisburg because dilatations were not being performed. Although Berman was able to self dilatate prior to his arrival at Lewisburg, it was not permitted by Lewisburg officials out of a concern for potential liability. As a result, within two weeks of the plaintiff's arrival, Dr. Daniel Romero, staff physician at Lewisburg, referred Berman to an outside gastroenterologist, Dr. Vladimir Petorak, on September 22, 1993. (Doc. 84, p. 2, ¶ 7) (Defendant Exhibit 29). Dr. Petorak recommended weekly dilatations (Defendant Exhibit 29), which would take place in his office even though he informed prison officials that Berman was quite capable of performing them on his own. The first dilatation was performed by Dr. Petorak on September 24, 1993. (Doc. 84, p. 2 ¶ 8). Weekly dilatations would continue to take place at Dr. Petorak's office until February 10, 1994, when Lewisburg officials, David Combs, Physician's Assistant Roland Williams, and Prison Physician Dr. Arthur Keiper, advised the plaintiff that they would establish a procedure for him to self dilatate at the prison. At the February 10, 1994 visit, Dr. Petorak noted that there was a small amount of bleeding from the surrounding dermatitis, but otherwise the

ileum was healthy. (Defendant Exhibit 44).

As to the closed end bags, plaintiff received a sufficient number of bags up until December of 1993, when Mr. Combs told him that they were weaning him off 7–10 closed bags per day because it was becoming too expensive. (Doc. 86, p. 9, ¶ 32). From December 2, 1993, to January 29, 1994, he was limited to an average of 4 bags per day, and from January 29, 1994, to February 10, 1994, he was limited to 3 bags per day. (Doc. 86, pp. 9–10, ¶ 33). Mr. Berman advised Dr. Petorak on December 17, 1993, of his inadequate supply of bags and was given 30 closed bags by Dr. Petorak's office on December 17, 1993, and again on February 10, 1994. (Doc. 86, p. 10, ¶ 33). Thus, from December 2, 1993, to February 10, 1994, plaintiff received an average of 4½ bags per day. Although the dilatations were performed by Dr. Petorak's office up until February 10, 1994, he was unaware of the fact that plaintiff was being issued closed bags instead of open end bags.[3] The reason for this was that only the nurses in the office would look at the type of bag Berman was using. Dr. Petorak would not be involved in this process. In fact, he never saw the type of bag the plaintiff was using because the plaintiff always removed his bag in the bathroom prior to receiving any dilatations or examinations. Furthermore, no one at the prison ever contacted Dr. Petorak during this period to discuss the type of bag used by the plaintiff. Nevertheless, as stated above, except for a small amount of bleeding from the surrounding dermatitis, there was no evidence of further damage as of February 10, 1994.

*February 10, 1994 to April 14, 1994*

From February 10, 1994, to April 13, 1994, plaintiff did not see an outside physi-

---

**3.** Unlike in closed bags, fecal matter would pass through open bags into the toilet and could be cleansed and reused. Consequently, a patient would use fewer open bags.

cian and was treated solely by the Lewisburg staff. While the plaintiff was now allowed to self dilatate, he was unable to do so on a regular basis because of: (1) lack of passes to get to the medical area, which were identified as "call outs"; (2) lack of availability of supervisory personnel; and (3) appointments were scheduled immediately after meals which physically prevented him from dilatating because dilatations were not to be performed until sufficient time had elapsed after eating. Due to these existing impediments, the next dilatations did not take place until March 22, 1994, and March 29, 1994, more than a month later. He was scheduled for supervised self-dilatations on March 14, 1994, March 15, 1994, and March 18, 1994; but refused because he had just eaten. (Doc. 84, p. 3, ¶¶ 14, 15, 17) (Defendant Exhibits 48, 49, 50). Additionally, he failed to report to the treatment room for self-dilatation on April 5, 1994, because he was not given a "call out" pass, and also on April 12, 1994. (Doc. 84, p. 3, ¶¶ 19, 20) (Defendant Exhibit 55). With regard to the April 12, 1994 appointment, Berman did eventually appear but did not want to continue to dilatate until he was evaluated by an outside gastroenterologist. (Defendant Exhibit 55). He had been complaining of bleeding from the ileostomy since April 9. The lack of dilatations between February 10, 1994, and April 9, 1994, resulted in stricture of the stoma, causing a back-up of fecal material in the bowel. (Berman Tr. at 51). The back-up of fecal material created dizziness as well as weakness and pain. Id. at 51–52. During this period, Berman lodged complaints to various physician's assistants and Mr. Combs on a regular basis, but no action was taken to remedy the situation. Id. at 52.

In addition to his complaints about lack of dilatations, plaintiff told prison officials that he was not receiving an adequate number of bags. As a result, Dr. Romero spoke to Dr. Petorak on February 28, 1994, about the number of bags needed by the plaintiff on a daily basis and Dr. Petorak indicated that 1–2 bags were sufficient. (Defendant's Exhibit 46, Romero Dep. at 15, 16). Dr. Romero admitted, however, that he did not tell Dr. Petorak that the plaintiff was using a particular type of bag, viz., a closed end bag. (Romero Dep. at 43). On March 28, 1994, prison officials (Dr. Keiper, Arnold Reyes, and Combs) advised Berman that, via verbal and written communication with Dr. Petorak, they were informed that typical patients with his condition use about 1 bag per day. (Defendant Exhibit 52). Therefore, it was their opinion that 2–3 bags a day would be sufficient. In informing Berman of the decision, prison officials stated that "there is no apparent medical justification for you to be using eight or more bags per day." Id. Dr. Petorak apparently made such a recommendation because he believed that Berman was using a type of bag other than a closed end bag. He first became aware of such on April 13,1994, when Lewisburg officials made an emergency appointment for the plaintiff. After discussing the type of bag with his intrastomal nurse, he recommended that Berman receive 7–8 bags per day. (Defendant Exhibit 58). Based on this recommendation, Dr. Keiper ordered that Berman receive 7–10 bags per day which he did receive until he left Lewisburg. Because plaintiff repeatedly complained that he was not receiving a sufficient number of the type of bag that he normally used, i.e., closed end as distinguished from open end, prison officials should have inquired and determined whether plaintiff was being supplied the proper bag.

The appointment with Dr. Petorak on April 13th was made because Berman complained to prison officials of a bleeding ileostomy on April 9, 1994; April 10, 1994;

April 11, 1994; and April 12, 1994. The record reveals that Dr. Keiper was first notified of the bleeding by prison personnel at 6:00 p.m. on April 11, 1994. (Doc. 58, p. 5, ¶ 18). Prison officials contacted Dr. Petorak on April 13, 1994, advised him of the bleeding and requested that he see the plaintiff as quickly as possible. (Petorak Dep. at 71). Berman was seen and examined by Dr. Petorak on April 13 and the examination revealed some blood around the ostomy and within the ostomy itself. After performing the examination, Dr. Petorak felt it necessary to admit Berman to Evangelical Hospital to determine the source of the bleeding. An ileoscopy was performed on Berman on April 14, 1994, which demonstrated stenosis, i.e., a narrowing at the opening of the ostomy site, irritation with trying to pass stool through the stenotic area, as well as some blood and four ulcerations immediately within the ostomy. Dr. Petorak opined that, based on the history provided by the plaintiff, the stenosis was caused by lack of dilatations. (Petorak Dep. at 79). Dr. Petorak never made any recommendation, either written or orally, that the plaintiff should have surgical revision of his ileostomy. *Id.* at p. 121. He did recommend, however, that weekly dilatations should be continued to avoid chronic stenosis and bleeding episodes. (Defendant Exhibit 58). Dr. Petorak referred the plaintiff to Dr. Nayeem Akhtar, a gastroenterologist, and did not treat the plaintiff again after April 14, 1994. Consequently, the deterioration of plaintiff's ileostomy from February 10 to April 14, 1994, was directly caused by the defendant's failure to provide for self-dilatation and to supply an adequate number of closed bags.

*April 14, 1994 to August 3, 1994*

On April 22, 1994, the plaintiff was transported to Sunbury Community Hospital where he was examined by Dr. Akhtar, who performed a balloon dilatation of the ileostomy. Dr. Akhtar observed that the ileostomy was stenosed, that he could not fit the tip of his little finger into the ostomy, and that Berman was in pain. (Akhtar Dep. at pp. 25). Dr. Akhtar acknowledged that this was the first time he had ever performed a balloon dilatation. *Id.* at pp. 18–19. Following the dilatation, Berman underwent a gastrografin x-ray (small bowel series) which revealed no evidence of obstruction or stenosis inside the bowel itself. The next balloon dilatation by Dr. Akhtar took place on April 27, 1994. The same conditions were observed. Subsequent to the dilatation, Dr. Akhtar recommended another small bowel series and a possible repeat dilatation depending on the findings. Although a request to schedule the small bowel series with Dr. Akhtar was made by Dr. Keiper on May 4, 1994, it did not take place until May 26, 1994. In the interim, prison officials examined the plaintiff on May 13, 1994, and May 21, 1994, and found his ileostomy to be excoriated and stenotic. The May 26, 1994 x-ray demonstrated the same results as the one taken on April 22, and this information was conveyed to Dr. Keiper. *Id.* at pp. 62–63. After reviewing the results of the small bowel series, Dr. Akhtar could not definitively state if Berman would require further dilatation. *Id.* at 49. He presumed that the prison doctor would call if the plaintiff was symptomatic and needed a dilatation. *Id.*

Pursuant to his complaint of illness, Berman was transported to Sunbury again on June 10, 1994, where another balloon dilatation was performed. At this time, Dr. Akhtar recorded that Berman was suffering abdominal pain, nausea, vomiting, redness, and excoriation of the stoma site. *Id.* at pp. 44–45. He concluded that the stoma was further stenosed than on previous examinations. *Id.* at p. 45. It was very tight, and he could not put the tip of

his little finger through it. *Id.* at 69. Subsequent to the examination, Dr. Akhtar recommended that Berman be dilatated again in a week, and that he may require a total of 3–4 more dilatations. *Id.* at p.65. No dilatations had been performed between April 27, 1994, and June 10, 1994. Despite his complaints over this period, prison officials took no corrective action. It was only after he collapsed on the floor and began to vomit blood that prison officials initiated the June 10th appointment with Dr. Akhtar.

On June 17, 1994, Dr. Akhtar performed another balloon dilatation on the plaintiff. He recommended that Berman should be dilatated in a week, and if this dilatation was not satisfactory, surgery would be required. (Akhtar Dep. at 74). Dr. Akhtar discussed possible options with the plaintiff, including further dilatation, surgical revision, or the creation of a new ostomy. *Id.* at p. 30–31. Berman was not too eager for surgery to create a new ostomy and expressed interest in continuing with the dilatations. *Id.* at pp. 26, 30, 31, 85. Further balloon dilatations were performed by Dr. Akhtar on June 28, 1994, and July 13, 1994. Although Dr. Akhtar was performing dilatations of the stoma, they were not done on a regular basis as recommended by Dr. Petorak. The lack of dilatations was the result of a breakdown in communications between Dr. Akhtar and prison officials as to who was responsible for arranging appointments. Dr. Akhtar did not know why he didn't see Berman on a regular basis. *Id.* at pp. 46, 47, 49, 87. The plaintiff was not seen by Dr. Akhtar after July 13, 1994. *Id.* at 95. Inasmuch as Dr. Akhtar was relying on prison officials to arrange for examinations and/or dilatations, it was negligent for prison officials to fail to make such arrangements from April 27 to June 10, 1994, when they knew, or should have known, that plaintiff's condition was worsening. Moreover, after June 10, 1994, to August 3, 1994, it was negligent for prison officials to fail to make regular appointments on a weekly basis with Dr. Akhtar.

*August 3, 1994 to September 1, 1994*

On August 3, 1994, prison officials sent Berman to Geisinger Medical Center where he was seen by Dr. Arthur Colley, a Board Certified Gastroenterologist, pursuant to a recommendation for a second opinion by Dr. Akhtar. *Id.* at p. 80, 100. Dr. Colley found that Berman had significant ileal stenosis which was symptomatic, and conveyed the following impressions to Dr. Keiper on August 8, 1994:

> I have advised the patient that dilatation is not considered to be currently an appropriate mode of therapy for patients with stomal strictures. In fact, it is often considered to be a contraindication because of the damage that it can do to the tissues in the area. I have told the patient that I would not perform further dilatations and that it would be appropriate for him to have surgical revision of his ileostomy, which hopefully would keep him free of the need to do any dilatations for an extended period of time.... I would suggest that the patient seek surgical revision of the stoma.

(Doc. 58, pp. 7–8, ¶ 36).

Subsequently, on August 11, 1994, the medical staff at Lewisburg submitted a request to transfer Berman from Lewisburg to a federal medical facility such as the one at FMC Fort Worth, Texas. After being rejected and resubmitted, the transfer was approved on August 24, 1994. *Id.* at p. 8, ¶¶ 38, 39. Upon receiving the recommendation of Dr. Colley, the Lewisburg medical staff acted promptly and reasonably in requesting a transfer to a federal medical facility that could provide the needed treatment. Therefore, there was no negligence attributable to defendant for

the period from August 3, 1994, to September 1, 1994.

### Fort Worth—September 1, 1994 to November 1, 1996

When plaintiff left Lewisburg he was suffering from significant stomal strictures after an unsuccessful regimen of dilatations. The transfer to FMC Ft. Worth was to implement the recommendation by Dr. Colley that dilatations were to be discontinued because they could cause further damage to the tissues and to arrange for a surgical revision of the ileostomy. Although the surgery could have been performed at private facilities in the Lewisburg area, the decision was made to transfer plaintiff to another federal facility for that purpose. (Doc. 86, p. 21, ¶ 76) (Plaintiff Exhibit 60). FMC Ft. Worth was also a facility capable of providing post-surgical care that could not be provided at Lewisburg. (Doc. 88, p. 4, ¶ 71) (Keiper Dep. at 101, 102). Berman advised medical personnel at Ft. Worth that he was sent there for surgery, and that he hoped that they would get him down that road as quickly as possible. (Berman Tr. at 89). A request for a gastrointestinal and surgical consult was approved by prison physician Dr. J. Barry for Berman on September 6, 1994.[4] (Doc. 58, p. 8, ¶ 41) (Defendant Exhibit 75). However, Berman was not seen by a prison Doctor at Ft. Worth until September 23, 1994, when he was interviewed by Dr. Anthony Cubb. (Doc. 58, p. 8, ¶ 42). Dr. Cubb told the plaintiff that, although Dr. Colley may have recommended surgery, he would not proceed on the perception of another practitioner unless he had a good solid ground to pursue that issue. (Cubb Dep. at 120–121).

The plaintiff was first examined by Ft. Worth Consulting physician, Dr. Charles Wilson, a certified general surgeon, on September 27, 1994. At the time of examination, Dr. Wilson tried to digitally dilatate plaintiff's ileostomy, but there was too much discomfort and the ostomy site was tight and strictured. Dr. Wilson subsequently recommended dilatation under anesthesia and daily dilatation. (Defendant Exhibit 75).[5] On October 22, 1994, Dr. Cubb requested a consultation by Dr. Patrick Trinkle, who is certified in internal medicine and gastroenterology, to reassess the need for dilitation/intervention. (Defendant Exhibit 78). On October 27, 1994, the plaintiff was seen by Dr. Trinkle, who recommended that Berman be referred to a surgeon to determine whether dilatations should continue or whether surgery should be performed. *Id.* Both Dr. Trinkle and Dr. Wilson confirmed that Berman's ileostomy was very stenosed. Dr. Wilson concluded that the stenosis occurred as a result of not being able to dilatate his ileostomy at the previous place of incarceration. Instead of recommending surgery, Dr. Wilson performed a dilatation of Berman under anesthesia on November 3, 1994. He thereafter recommended that the nursing staff at Ft. Worth digitally dilatate the ileostomy on a "b.i.d. basis" (twice a day). (Plaintiff Exhibit 72). Dr. Wilson saw the plaintiff again on November 10, 1994,

---

4. Generally, Dr. Cubb testified that he would make a recommendation for a request to a consultant, which would have to be approved by Dr. Barry. Once the request was approved, Dr. Barry would direct it to the proper administrative person for that request to be carried out. (Cubb Dep. at 49).

5. With regard to the general scheduling of procedures, Dr. Wilson testified that he would make a recommendation for whatever procedure needed to be done. The recommendation would then be given back to the facility at the time of consultation. After that, the facility would contact him and give him a time frame in which to do the procedure. (Wilson Dep. at 78).

and recommended the continuation of daily dilatation. (Plaintiff Exhibit 74). Dr. Wilson was not aware of any prior recommendations of surgery, and does not recall reviewing any medical records. (Wilson Dep. at 60).

Dr. Cubb reviewed Dr. Wilson's recommendation and ordered prison nurses to perform the digital dilatations. There were a total of 92 dilatations (44 of which were digital) performed on the plaintiff from November 3, 1994, through May 15, 1995. During this period of time, Dr. Wilson did not observe any dilatations, did not review any of the records of such dilatations made by the prison nurses, and did not recommend any changes in the frequency of dilatations. By contrast, the nurses performing the dilatations advised Dr. Cubb of Berman's treatment on a daily basis, and he was present for most of them. (Cubb Dep. at 38). The performance of dilatations was contrary to Dr. Colley's prior recommendation at Lewisburg, and the plaintiff frequently complained to Dr. Cubb about this but Dr. Cubb replied that the plaintiff was now under his care, and the course of action taken by other doctors was irrelevant. (Tr. Aug. 8, p. 100). Although the performance of dilatations was contrary to Dr. Colley's recommendations, it was consistent with the recommendation of Dr. Wilson which prison officials could appropriately follow.

On January 4, 1995, Dr. Cubb requested a general surgery consult from Dr. Wilson to address the plaintiff's bowel stricture. (Defendant Exhibit 140). Dr. Cubb made the same request to Dr. Trinkle on January 9, 1995. (Defendant Exhibit 219). Dr. Wilson saw Berman on January 19, 1995 [6], and recommended that plaintiff have a sur-

gical revision of his ileostomy due to persistent stenosis, and that he be transferred to another facility for that purpose. (Defendant Exhibit 140). Dr. Wilson stated that it was his decision that "attempts at conservative measures were carried out first before surgical recommendations." (Wilson Dep. at 22). The fact that another doctor had already recommended a revision of the ileostomy would "not necessarily" affect his opinion of the way to treat the plaintiff. *Id.* at 61.

On January 26, 1995, Dr. Trinkle also observed that Berman required surgical revision due to ostomy stenosis. In making his recommendation, Dr. Trinkle noted "consider Dr. Jacobsen at Baylor Dallas." (Defendant Exhibit 219). Additionally, Surgery was recommended by Dr. Cubb on January 23, 1995, but not forwarded to the office of medical designation until March 1995. (Doc. 86, p. 30, ¶ 113) (Plaintiff Exhibit 88).

Berman was finally seen by a colorectal surgeon, Dr. Robert Jacobsen of Baylor University, on February 10, 1995, after a referral from prison physician Dr. J. Barry. At that time, Dr. Jacobsen recommended some tests to rule out the possibility of Crohn's disease, followed by an ileostomy revision with or without laparotomy to free up any adhesions. (Defendant Exhibit 156). The plan for surgery was dependent upon when prison officials got the evaluation. (Jacobsen Dep. at 18). The tests were completed on February 23, 1995.

On March 6, 1995, prison officials requested that the plaintiff be transferred to another FMC which could provide him with the appropriate care. That request was denied with directions to secure the

6. Dr. Wilson did not see the plaintiff between November 10, 1994, and January 19, 1995.

(Wilson Dep. at 58).

care locally. (Doc. 86, p. 30, ¶ 115). Thereafter, a surgical consult request with Dr. Jacobsen was made by Dr. Cubb on March 17, 1995. (Plaintiff Exhibit 98). In making this request, the "emergency" box was circled with the notation "ASAP" directly below it. *Id.* Berman was not seen by Dr. Jacobsen until April 4, 1995, at which time he made the following recommendation: "Local revision on ostomy to repair stricture and prolapse a must at any time in the future. The sooner the better to reduce dilatations being done." (Plaintiff Exhibit 98). Dr. Jacobsen believed that dilatations were only a temporizing measure that would not permanently solve the problem, and that the dilatations were causing the plaintiff pain around the ileostomy site as well as on the left side of the abdomen. (Jacobsen Dep. at 58). Moreover, he was of the opinion that the process of digitally dilitating the plaintiff was inappropriate, and was causing damage to the ileostomy. *Id.* at 58–59. He stated that when there is a narrowing or stricture of the ileostomy, he would revise the site and would not recommend any form of dilatation. *Id.* at 47. Finally, Dr. Jacobsen noted that he could have been available to perform the surgery within a week of April 4, 1995, and that it was his impression that Berman wanted it done as soon as possible to alleviate the pain and discomfort that he was experiencing. *Id.* at 60. Despite the recommendations for surgery by Dr. Wilson on January 19, 1995, Dr. Trinkle on January 26, 1995, and by Dr. Jacobsen on February 10, 1995, and April 4, 1995, dilatations continued up until May 15, 1995.

Berman's ileostomy was surgically revised by Dr. Jacobsen on May 18, 1995. The surgery required general anesthesia, following which a circumferential incision was made in Berman's abdominal wall in the area of the stoma. The damaged portion of the ileum was cut off and a new stoma created in the same location with ileal tissue that had previously been below the skin surface. This was the same procedure first recommended by Dr. Colley in August of 1994. As a result of the surgery, the flow of waste material improved, and Berman no longer needed to dilatate. Berman was discharged from Baylor Hospital on May 22, 1995. The discharge summary prepared by Dr. Jacobsen noted that the plaintiff was to follow up with Dr. Jacobsen in two weeks, which never took place. (Defendant Exhibit 183).

The surgical revision of the ileostomy prompted the need for bags with a 2 inch opening rather than 1½ inches that he had been using. Such bags were provided to Berman at Baylor Hospital. Prison officials noted the need for such bags on May 22, 1995, but did not supply them to the plaintiff until June 28, 1995. (Plaintiff Exhibit 115). Berman complained about the improper bags in writing on several occasions. In the interim, plaintiff used bags that he modified, which did not fit securely and caused fecal matter to come into contact with the skin impeding post-surgery healing.

Pursuant to a surgical consultation request (Defendant Exhibit 186), Dr. Wilson examined the plaintiff on June 22, 1995, and recommended a follow up visit with Dr. Jacobsen. That visit was not scheduled until July 27, 1995. At that time, Dr. Jacobsen noted that the ileosotmy was fairly swollen, that the surrounding area showed some irritation, and that Berman was complaining of abdominal pain. He suspected adhesions and the need to further revise the ileostomy. (Doc. 86, p. 33, ¶ 128). Although Dr. Jacobsen had asked prison officials to return the plaintiff for further examination in a month, a follow up appointment was not scheduled until September 28, 1995, more than two months later. (Plaintiff Exhibits 114, 117).

Following the September visit, Dr. Jacobsen noted that further surgery may be necessary. (Defendant Exhibit 188). Precisely, he noted that "I think he is going to need to have a laparotomy, upper endoscopy, lysis of adhesions, take down of the old ileostomy, and some of the small bowel proximal to it." He further noted that "I do not think that this is something that has to be done now, it can be done at a convenience basis over the next several months, but to wait a year and half might be too long." *Id.* On November 1, 1995, Dr. Barry examined Berman and advised him that he needed to decide whether he wanted to have the recommended surgery and that Berman would have to make the decision in the next 2–3 weeks. Berman expressed his need to consult his family and attorney. (Doc. 58, p. 11, ¶ 67).

On November 7, 1995, Berman was taken to the infirmary in acute pain from a prolapsed ileostomy, when the ileostomy protrudes through the opening farther than it should. The incident occurred when the plaintiff was walking around the prison yard. Berman remained in the infirmary for over six hours before he was taken to Dr. Jacobsen's office. During that time, he was able to massage his exposed bowel back into his body. On that same date, Dr. Tulanon of Dr. Jacobsen's office saw Berman and acknowledged the prolapse, but noted "no need for hospitalization now unless incarceration of prolapse then emergency surgery will be required." (Doc. 58, p. 11, ¶ 69). On December 17, 1995, Berman reported to the clinic to show the staff that his ileostomy had prolapsed, but refused treatment and said that he could massage it back into place himself. (Doc. 58, p. 12, ¶ 70).

On January 12, 1996, Dr. Jacobsen performed another surgical procedure on the plaintiff while under general anesthesia, which involved a twelve inch long incision in his abdomen, the removal of additional ileal tissue and the creation of a new stoma in the same location, and the repair and removal of scar tissue or adhesions in the abdomen. (Doc. 86, p. 34, ¶ 133). Berman was discharged from the hospital on January 22, 1996. This surgery was needed to repair the same area which had not properly healed. (Doc. 86, p. 35, ¶ 134). The discharge summary prepared by Dr. Jacobsen on January 22, 1996, indicated that the plaintiff was to be returned to his office for post-surgical follow up in two weeks. (Defendant Exhibit 216). Prison officials did not abide by this instruction, and incorrectly informed the plaintiff that Dr. Jacobsen did not request a follow-up. (Plaintiff Exhibit 128).

After the January 12th operation, the size of Berman's ileostomy changed again, necessitating the use of 1½ inch bags. These were provided to the plaintiff at Baylor Hospital after the surgery, but not supplied to him by prison officials until February 29, 1996. (Plaintiff Exhibit 128). Up to that point, Berman was required to continue to use 2 inch bags, which allowed fecal matter to come into contact with the area surrounding the ostomy further impeding post-surgical healing. (Doc. 86, p. 35, ¶¶ 136–37).

Following the second surgery, Berman continued to experience significant pain, incidents of prolapse, swelling of the stoma, and the bowel pushing on the abdominal wall. The plaintiff's incidents of prolapse were caused by the weakening of the abdominal wall due to the surgical procedures and repeated dilatations performed at Ft. Worth. (Colletta Tr. at 89–90). While the possibility of additional surgery was discussed, both Berman and prison officials concurred that it would be better to delay the surgery until after his discharge from confinement. The plaintiff

was transferred to a half-way-house in Philadelphia on November 1, 1996, and released from custody in April of 1997.

Dr. Colletta eventually performed additional surgery on the plaintiff on February 9, 1999. While under general anesthesia, an elliptical incision was made in the plaintiff's abdomen and a major revision of the ileostomy was performed. This involved the removal of abdominal skin and ileal tissue to create a new stoma in the same location. The surgery was needed to address the damage caused by the improper size bags, which resulted from exposure of fecal material to the skin surrounding the freshly cut tissue causing inflammation and stricture formation. (Colletta Tr. at 88, 89, 93).

### Discussion

Initially, it should be noted that there is nothing in the record to suggest that plaintiff deliberately or carelessly avoided the opportunity for treatment. His willingness to undergo painful digital dilatations regularly at Fort Worth fortifies that conclusion. Furthermore, it cannot be disputed that his condition, which was relatively uneventful prior to his transfer to Lewisburg, deteriorated significantly during the remainder of his prison sentence.

■ If plaintiff had completed his sentence on February 10, 1994, his condition would be relatively and easily treatable on the outside. But, because he remained incarcerated and subject to the care of defendant, his condition deteriorated and his symptoms were not meaningfully relieved until Dr. Jacobsen performed the surgical revision on May 18, 1995. While different modes of treatment were recommended and instituted by outside specialists prior to that time, some were inconsistent and none were successful. By way of example, Dr. Colley recommended that dilatations be discontinued and that surgery be attempted, while Dr. Wilson later recommended the continuation of dilatations and postponement of surgery. However, the failure to provide for dilatations and supply appropriate bags at Lewisburg, according to Doctors Petorak, Wilson, and Colletta, was the direct cause of plaintiff's ileostomy problems and the complications that ensued. Even defendant's medical expert, Dr. Sollenberger, stated that "it was highly probable, but not certain, that the restriction from self dilatation of the stoma in 1993 and 1994 resulted in increased stricturing of the stoma and eventually necessitated his surgery in May of 1995". Dr. Colletta did not fault the treatment prescribed by any of the outside physicians and did not testify that their conduct fell below acceptable standards. He did opine, however, that prison physicians at Lewisburg should have known that one to two closed end bags per day were not enough and, also, that if Dr. Cubb supervised the program of digital dilatations at Fort Worth, he should have observed that it was not successful and promptly stopped it. The court agrees. The evidence established that, if it were not for the negligence by prison personnel at Lewisburg, the additional pain and distress caused by the digital dilatations would not have occurred. Although there were continuing efforts made to rectify his condition, both within the prisons and through the use of outside physicians, plaintiff's condition did not improve. In fact, it was exacerbated by the failure of prison officials at Lewisburg and Fort Worth to seek outside consults more promptly, to schedule appointments as needed, and to oversee plaintiff's condition more closely. Nevertheless, as previously noted, the original cause occurred at Lewisburg and was never broken or superseded by subsequent conduct or omissions.

The May 18, 1995, surgery was not completely successful. Consequently, Dr. Ja-

cobsen performed a second surgical procedure in which he removed scar tissue and created a new stoma to repair the area which had not healed properly. The healing process after both surgeries was delayed by the failure of Fort Worth prison personnel to supply appropriate sized bags. After the second surgery, both prison officials and plaintiff agreed that the need for additional surgery should not be determined while he remained in prison but should be addressed after his release which occurred in April, 1997. Thereafter, on February 9, 1999, Dr. Colletta performed a major revision of plaintiff's ileostomy which was necessitated by inflammation of the surrounding skin and stricture formation caused by the previous use of improperly sized bags.

The remaining question involves a determination of the extent of plaintiff's pain and suffering and the amount of damages that should be awarded to him as compensation. During the period from September 8, 1993, to his release to a halfway house on November 1, 1996, plaintiff experienced pain, weakness, agitation, and nausea in varying degrees. It must be recognized, however, that he had a preexisting condition that would cause some limitations, discomfort, anxiety, and inconvenience. While there was some distress throughout his course of treatment, it was more acute at certain times. It appears that plaintiff was able to continue to perform his prison work in the pipe-fitting shop as well as other assignments. He was able to move about the prison in much the same way as other inmates. Moreover, the pain and inconvenience diminished somewhat after the surgery on May 18, 1995. The recommendations for surgery at Lewisburg by Doctors Akhtar and Colley did not describe the situation as an emergency. Similarly, at Fort Worth, Dr. Trinkle merely requested a surgical consult and Dr. Wilson concluded that conservative treatment by dilatations was preferable over surgery. On April 4, 1995, Dr. Jacobsen stated that surgery was "a must at any time in the future ... the sooner the better to reduce dilatations being done". In fact, the only recorded reference to an emergency was by Dr. Cubb on March 17, 1995, in his request for a surgical consult. Notwithstanding the absence of an emergency, it cannot be denied that plaintiff was experiencing some pain and suffering. However, the distress must have been more pronounced from early April, 1994, to the first surgery on May 18, 1995, and again during the period that plaintiff was subjected to digital dilatations. The pain and suffering at other times was episodic and varied in intensity. Consequently, after considering all the pertinent evidence, plaintiff will be awarded $150,000.00 for his pain and suffering caused by defendant's negligence. The claim for post-release medical expenses was not challenged sufficiently and will be allowed.

The evidence on loss of earning capacity was vague, speculative and, inadequate to support a monetary award and none will be made.

Accordingly, the court will enter judgment in favor of the plaintiff, Jeffrey Berman, in the amount of $178,294.00.